UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOSEPH ANTHONY CASTRO,

Petitioner,

v.

PATRICK COVELLO,

Respondent.

No.  2:22-cv-2005 CKD P

ORDER AND

FINDINGS AND RECOMMENDATIONS

Petitioner is a California prisoner proceeding with a petition for a writ of habeas corpus under 28 U.S.C. § 2254.  The operative petition is the second amended petition filed April 10, 2023.  ECF No. 11. The matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Local Rule 302(b).  For the reasons that follow, the court recommends that the petition be denied.

I. Background

On April 18, 2016, a San Joaquin County jury found petitioner guilty of first-degree murder.  ECF No. 16-3 at 181.  On May 23, 2016, he was sentenced to 26 years to life in prison. Id.  On appeal, the California Court of Appeal summarized the evidence presented at trial as follows:

> *The Preceding Confrontation*
>
> [Jesse]  Hernandez  and  his  friend  [Jorge]  Rodriguez  met  at  the

1

Corona Liquor store [in Stockton] on the evening of May 30, 2015. Rodriguez bought two or three 25-ounce cans of beer. The pair crossed the street to Taqueria El Grullense, where Hernandez got a burrito. After Hernandez got his burrito, they stood outside the restaurant for several minutes, "just chilling." Their reverie was interrupted when defendants pulled up next to Corona Liquor in a blue, early 2000's Chevrolet pickup truck. Joseph drove and [petitioner's brother] Alex was in the passenger seat. As they pulled up, the two gave Rodriguez and Hernandez "a little look."

Rodriguez was once friends with Alex. They had a falling out in 2014 after Rodriguez's brother was arrested for armed robbery and Rodriguez accused Alex of being a snitch. After the falling out, they got into verbal and physical confrontations. Rodriguez knew Joseph, but not as well. They had exchanged words but never fought each other.

Joseph entered the liquor store and then returned to the truck. He drove down the street and turned right at the intersection. Rodriguez testified that, as the truck passed, Alex leaned out and said, "I'm gonna get both you guys," "We gonna get you both motherfuckers," and that they were going to kill them. He told the police both defendants yelled, "We'll kill you guys." Rodriguez ran up to the truck and yelled back, "Shut the fuck up," and "Fuck you, motherfuckers."

Cesar Silva was visiting his girlfriend at the home of her mother, Vernita Lymuel, when he saw a man standing on the corner in front of Taqueria El Grullense arguing with two men in a truck. The man on the corner had his hands in the air and was yelling. The truck's passenger was sitting on the windowsill of the truck. The passenger's upper body was out of the window, his hands were up in the air, and he was yelling. The truck drove by Lymuel's house at about 35 miles per hour.

*The Incident*

Rodriguez and Hernandez stood outside the restaurant for a few minutes and then got some beer at the liquor store to take to Hernandez's apartment. They did not see defendants or the truck while walking back. Hernandez entered his home when they arrived, while Rodriguez stayed outside and drank his beer. Hernandez came back out with marijuana, which they smoked.

Rodriguez heard screeching tires; he looked up and saw the Silverado pickup truck turn onto the street and pull up to Hernandez's apartment. Alex, the driver, and Joseph got out of the truck; Alex yelled, "I told you we were gonna come back. We're gonna get you guys."

Defendants approached the residence together. Hernandez and Rodriguez went inside and locked the door. There was knocking on the front door. Alex screamed and demanded them to come outside. Glass broke, with shards from the front window going into the living room. Hernandez was angry that his home was being attacked and

2

told Rodriguez to come on. He then opened the door and went outside.

Rodriguez followed Hernandez about 10 to 15 seconds later. He saw Hernandez and Alex fighting in the front yard. They fought a little bit towards the carport, while Joseph stood on the curb looking at Hernandez and Alex. Rodriguez saw Alex trying to hit Hernandez with a golf club. Hernandez was on the ground. Rodriguez grabbed a fishing rod from the front yard and struck Alex in the head with it. Alex and Joseph then ran off to their truck; Alex drove off, with Joseph in the passenger seat.

Lymuel was watering her front yard on the evening of May 30, 2015, when she saw Hernandez and Rodriguez walk by to Hernandez's apartment from the direction of the liquor store. She later heard a car skidding and in less than a minute a man yelled, "Come out of the house, motherfucker," and "Come out of the house right fuckin' now."

After hearing glass break, Lymuel ran across the street toward Hernandez's apartment. She saw a navy blue or black truck facing the wrong way parked in front of Hernandez's apartment. Rodriguez was on the front porch swinging a stick at two Hispanic boys while screaming, "get the hell away." A boy wearing black or blue shorts and wearing a white T-shirt ran around the truck and hopped in the passenger side.[1] The second boy backed up, got into the driver's seat, and drove the two away in the truck. Hernandez was lying on his back; he appeared to be in shock and there was blood on the ground, by his left side. Lymuel called 911.

Jesus Diaz lived in the same triplex as Hernandez. On the night of the incident, he saw Hernandez and Rodriguez walking on the sidewalk towards Hernandez's apartment. Soon thereafter, he heard what sounded like a bomb and glass breaking. Diaz heard yelling outside and someone screaming, "Help, help, help." Diaz went outside, where he saw glass on the ground and a broken window by Hernandez's front door. Defendants' truck was leaving from the front of Hernandez's apartment. Hernandez was on the ground; he was bleeding and Rodriguez was crying and trying to help him.

David Cisneros was playing basketball in the backyard of his friend's house, directly across from Hernandez's apartment. He heard screeching tires followed by fighting and yelling. Cisneros went outside and saw three people fighting in front of Hernandez's apartment. One person had what appeared to be a baseball bat in his hands. A fourth man came from around the apartment's corner, yelling at two of the men and trying to fight them off. The two men started fighting the fourth man; they exchanged a few blows and then ran off to a dark blue older model pickup truck parked nearby and left.

Samuel Ojeda was with friends in the same house as Cisneros when he heard glass breaking. He ran outside and saw a man holding a

---

[1] Rodriguez testified that Alex wore a white T-shirt and shorts that night.

3

stick or something, banging on the front door of Hernandez's apartment. Hernandez opened the door a few seconds later; there was yelling, but Ojeda could not understand what was said. The man banging on the door and another man beat up Hernandez. The man with the stick used it to strike Hernandez in the head as Hernandez yelled and fought back with his hands up. After a fourth man came out of the apartment to help Hernandez, it broke into two separate one-on-one fights. When Hernandez dropped to the ground by his front door, the man helping Hernandez ran to him while the other two ran to their truck and left.

Richard Moncevais lived near Hernandez. Moncevais was inside his home at around 8:35 or 8:40 p.m. when he heard glass breaking. He opened the front door and saw two to four people fighting in front of Hernandez's porch. He saw them throw punches but did not see any weapons. After the fight, a dark truck parked in front of Hernandez's apartment quickly drove off. Rodriguez frantically yelled that Hernandez was down. Moncevais went over to help and saw Hernandez lying in a large puddle of blood by the front door.

*The Investigation*

The first 911 call was received at 8:37 p.m. Paramedics took Hernandez to the hospital, where he was treated for multiple stab wounds to the chest. He died at the hospital following surgery. The cause of death was the stab wounds, which included two to the heart. Abrasions and contusions on his body and head were consistent with being in a fight around the time of death. He had pattern injuries consistent with being hit with very violent force by a cylindrical object like a rod, and his forearms had defensive wounds. The lack of injuries to the hands suggested they had not been used during the fight. All four stab wounds were inflicted by the same knife.

Surveillance videos from Corona Liquor and Taqueria El Grullense between 8:00 and 9:00 p.m. on the day of the incident showed Hernandez and Rodriguez standing in front of the restaurant for several minutes while drinking. Joseph entered the liquor store at 8:22 p.m., bought a beer, and left. Shortly thereafter, a dark-colored pickup truck drove down the street and turned the corner by the restaurant as a person wearing a white T-shirt hung out of the passenger window. Rodriguez walked to the curb on the corner and watched the truck leave before returning to the front of Taqueria El Grullense. At 8:27 p.m., Hernandez was ordering food in Taqueria El Grullense as Rodriguez held a beer. They got the food and went outside at 8:30 p.m., then entered the liquor store for Rodriguez to buy more beer, leaving at 8:32 p.m. They walked south down the street in the direction of Hernandez's apartment one minute later. A blue pickup truck with a driver wearing a white T-shirt was driving behind the restaurant at 8:34 p.m.

Stockton Police Officer Beau Riley interviewed Rodriguez on the night of the incident. Rodriguez was upset; his breath smelled of alcohol but he could hold a conversation. Rodriguez said that when Hernandez went out to confront the two men, both men tried to hit him with golf clubs. While trying to defend himself, Hernandez

4

knocked down one of the clubs. Rodriguez grabbed the club and used it to strike Alex in the head. He never saw Hernandez get stabbed. Rodriguez later told a detective that he left the house after seeing the two men attacking Hernandez with golf clubs.

Broken headphones and a putter were found in the street in front of Hernandez's apartment. Another golf club was on the lawn near the front door. A broken piece of a fishing rod was near this golf club. The front door of Hernandez's apartment was damaged; the front screen door was caved in with visible indentations, and there were indentations around the deadbolt. The front window next to the door was shattered with the screen on the ground nearby. Two pieces of a broken fishing rod and a third golf club were found in separate parts of Hernandez's apartment.

A swab from the handle of the fishing rod on the lawn contained DNA from Joseph as a major contributor and from Alex as a minor contributor. Hernandez's DNA was found on the pole's shaft. His DNA was also found in blood on the handle of the putter found in the street. DNA from the blood on the putter's shaft matched Alex's. Hernandez's DNA was also found on the handle of the golf club that was on the lawn. A mixed DNA profile of Hernandez and a person unrelated to the incident was on the shaft of this club. DNA from the golf club found in Hernandez's apartment could not be interpreted.

*The Defense*

Alex called Stockton Police Officer Jason Mamaril as an expert on Hispanic street gangs. Rodriguez's brother Edgar Sanchez was a Norteño gang member who had convictions for second degree robbery and assault by means likely to produce great bodily injury with gang and firearm enhancements. The codefendant from Sanchez's case, Gisleno Max Morales, was also a Norteño gang member. Hernandez had gangrelated tattoos on his back and right arm, left arm and shoulder, and around his left wrist. He was documented as a Norteño in 2003 following several field interviews. Hernandez's apartment had graffiti related to "East Side Stocktone," a Norteño subset. He had prior convictions for possession of marijuana for sale in 2000 and felon in possession of a firearm in 2005. On cross-examination, Officer Mamaril concluded that there was no gang incident in this case, that Hernandez had no gang-related contacts since 2003, and was never a documented gang member.

ECF No. 16-22 at 3-8.

The Court of Appeal affirmed petitioner's conviction and sentence. ECF No. 16-22 at 44; ECF No. 16-24. Petitioner's California Supreme Court petition for review of the Court of Appeal's decision was summarily denied. ECF No. 16-27.

II. Standard for Habeas Relief

An application for a writ of habeas corpus by a person in custody under a judgment of a

5

state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ of habeas corpus is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.2d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following limitation on the granting of federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;
>
> or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different, as the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court

was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011). In this matter, the state Court of Appeal was the last court to issue a reasoned decision. ECF No. 16-22.

III.  Claims and Analysis

A.  Insufficient Evidence of State of Mind Required for First Degree Murder (Claim 8)[2]

Petitioner claims that there was insufficient evidence presented at trial as to the state of mind required for a finding of guilt on first degree murder. As noted by the California Court of Appeal, Alex was alleged to have been the principal in the murder of Jesse Hernandez and petitioner was alleged to have aided and abetted. ECF No, 16-22 at 9, n. 4. The California Court of Appeal addressed this claim as follows:

> On appeal, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560]; *People v. Johnson* (1980) 26 Cal.3d 557, 578.) "'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' [Citation.]" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)
>
> The mental elements of premeditated first degree murder are likewise well established. "'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.]' [Citation.] "'Premeditation

---

[2]  The court generally addresses petitioner's claims in the same order as the Court of Appeal did.

and deliberation can occur in a brief interval. 'The test is not time, but reflection. "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly."'" [Citation.]'" (*People v. Solomon* (2010) 49 Cal.4th 792, 812 (Solomon).) "'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' [Citation.]" (*People v. Pearson* (2013) 56 Cal.4th 393, 443.)

"When the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct] perpetrator,' that is to say, the person must 'know[] the full extent of the [direct] perpetrator's criminal purpose and [must] give[] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.' [Citation.]" (*People v. Lee* (2003) 31 Cal.4th 613, 624.) Thus, to be guilty of first degree premeditated and deliberate murder as an aider and abettor, a person must have "aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission. [Citation.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 166-167 (Chiu).) "An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder." (*Id.* at p. 167.) "Because the mental state component—consisting of intent and knowledge—extends to the entire crime, it preserves the distinction between assisting the predicate crime of second degree murder and assisting the greater offense of first degree premeditated murder. [Citations.]" (*Ibid.*)

The California Supreme Court in *People v. Anderson* (1968) 70 Cal.2d 15 articulated three categories of evidence that could show premeditation and deliberation: "planning activity, preexisting motive, and manner of killing. [Citation.]" (*Solomon, supra*, 49 Cal.4th at p. 812.) These categories of evidence are not exhaustive, but are helpful in this case where we find all three are present. (See *ibid.*)

Joseph claims the jury could infer Alex deliberated and premeditated in the time it took him to remove the knife from his pocket and fatally stab his victim, but he claims that was not evidence against Joseph. He finds there was no prior history of him feuding with Hernandez, he did not participate in the angry exchange of words by the restaurant, he was not the person who drove to Hernandez's apartment, he did not chase Hernandez and Rodriguez into the apartment, he did not break the window or bang on the door, he did not call them out, and he did not stab anyone. He further asserts that the evidence does not support any of the categories identified in *People v. Anderson, supra*, 70 Cal.2d 15, as supporting premeditation and deliberation.

Although [Rodriguez[3]] testified that only Alex threatened them when defendants drove by them in front of the restaurant, he told a police officer that both Alex and Joseph said they were going to kill them. While Joseph notes this was disputed by Rodriguez's trial testimony, the jury could nonetheless find the prior inconsistent statement to be more credible, and we will not second-guess that determination on appeal.

The testimony of a single witness can support a conviction unless the testimony is physically impossible or inherently improbable. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) The officer's rendition of Rodriguez's statement to him is neither, and therefore supports a finding that both Alex and Joseph expressed an intent to kill at this point, before the attack that led to Hernandez's killing. This supports the finding the killing was premeditated and deliberate rather than the product of a rash impulse during the fight.

Although Alex was the primary aggressor, Joseph was a willing participant. After the initial confrontation by the restaurant, Joseph chose to continue to go to Hernandez's residence with Alex after the two changed places as driver and passenger. He did not stay in the truck when Alex came out but came out and approached the apartment with his brother as Alex challenged the retreating Rodriguez and Hernandez to come out of the house. When Hernandez came out in response to the challenges and attacks on his home, there is evidence, the testimony or statements to the police of Rodriguez and Ojeda, that both Alex and Joseph attacked him with weapons, some combination of golf clubs and a fishing rod. Although there is no evidence of how these weapons were procured, Rodriguez testified and told the police that neither he nor Hernandez owned the golf clubs or fishing rod found at the scene, and that both defendants were armed with golf clubs when they arrived. The jury could reasonably infer that both Alex and Joseph brought potentially deadly weapons to a fight and attacked the murder victim with them in a two-on-one assault until Rodriguez intervened. (*See People v. Rhodes* (1989) 215 Cal.App.3d 470, 475 [a golf club can be a deadly weapon], disapproved on another ground in *People v. Barton* (1995) 12 Cal.4th 186, 198, fn. 7; see also *People v. Aguilar* (1997) 16 Cal.4th 1023, 1029 [objects not inherently deadly or dangerous may be deadly weapons].) Although Joseph did not deliver the fatal wounds, his previously expressed intent to kill combined with his participation in the attack on Hernandez, showed an intent to help his brother Alex achieve the goal of the deliberate and premeditated murder of the man who had previously accused Alex of being a snitch. Substantial evidence supports Joseph's first degree murder conviction.

ECF No. 16-22 at 9-12.

The Due Process Clause "protects the accused against conviction except upon proof

---

[3] The Court of Appeals opinion credits the testimony to "Hernandez," which the Court construes as a typographical error as Hernandez is the decedent.

9

beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). For a challenge to the sufficiency of the evidence, the court reviews the evidence in the light most favorable to the prosecution and determines whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). A federal court may only grant habeas relief upon finding the state court decision rejecting the claim was an objectively unreasonable application of Jackson and Winship to the facts of the case. Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011).

The standard of review of insufficiency of evidence claims identified by the Court of Appeal is not in conflict with either Winship or Jackson. Furthermore, the Court of Appeal and California Supreme Court's rejection of petitioner's insufficiency of evidence claim are not contrary to clearly established federal law as determined by the Supreme Court, do not involve an unreasonable application of clearly established federal law as determined by the Supreme Court, and are not based on an unreasonable determination of the facts. Therefore, habeas relief is precluded by 28 U.S.C. § 2254(d).

### B. Jury Instructions

#### 1. Aiding and Abetting (Claim 4)

Jurors were provided with the standard California instruction as to aiding and abetting, CALCRIM 401. Considering this instruction in isolation, petitioner claims the instruction permitted jurors to find petitioner guilty of first-degree murder without the requisite intent. The California Court of Appeal addressed this claim as follows:

> The problem with [petitioner's] argument is that "in determining the correctness of jury instructions, we consider the instructions as a whole. [Citation.]" (People v. Friend (2009) 47 Cal.4th 1, 49.) We reject his narrow and isolated reading of the instructions and review the adequacy of the instructions in light of the entire charge to the jury. (People v. Musselwhite (1998) 17 Cal.4th 1216, 1248.)
>
> The jury was instructed with CALCRIM No. 520 that if it finds the defendant guilty of murder, the murder is second degree "unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM No. 521." CALCRIM No. 521 correctly informed the jury the mental state for first degree murder was that defendant "acted willfully, deliberately, and with

10

premeditation."

> We must presume the jurors were able to correlate the relevant instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) CALCRIM No. 401 clearly explained the aider and abettor's required mental state, and CALCRIM Nos. 520 and 521 explained the elements of first degree and second degree murder and the requisite mental states for those crimes. Considered together, the instructions adequately informed the jury that, to find defendant guilty of first degree murder, it had to find defendant personally harbored the mental states of premeditation and deliberation. Specifically, the instructions directed the jury it could find defendant guilty of first degree murder on an aiding and abetting theory only if the jury found defendant "knew that the direct perpetrator intended to commit" first degree murder, that defendant "intended to aid and abet" the direct perpetrator in committing first degree murder, and that defendant "did in fact aid and abet the perpetrator's commission of" first degree murder. This is sufficient.

ECF No. 16-22 at 13-14.

The Court of Appeal's decision that the instruction identified above did not result in a misstatement of California law is not reviewable by this court. Hicks v. Feiock, 485 U.S. 624, 630 & n. 3 (1988) (federal habeas court is not at liberty to disregard a California Court of Appeal's rulings on state law when the California Supreme Court has denied review). As to the conclusion that the jury was properly informed as to the requisite mental state for a finding of first degree murder, petitioner does not point to anything suggesting rejection of the claim by California courts is contrary to clearly established federal law as determined by the Supreme Court, involves an unreasonable application of clearly established federal law as determined by the Supreme Court, or is based on an unreasonable determination of the facts. This being the case, habeas relief is again precluded by 28 U.S.C. § 2254(d).

### 2. CALCRIM 401 Does Not Require Premeditation (Claim 5)

Petitioner asserts that using CALCRIM 401 allowed the jury to find petitioner guilty of first-degree murder if his intent to aid and abet murder was formed during the commission of the murder and was not premeditated with malice aforethought. The California Court of Appeal addressed this claim as follows:

> [T]he instructions, read together, required the jury to find defendant premeditated and deliberated before finding him guilty of first degree murder as an aider and abettor. Even assuming premeditation is

11

impossible during (as opposed to before) the commission of the murder, [footnote omitted] it would be virtually impossible for a person to know of another's intent to murder and decide to aid in accomplishing the crime without at least a brief period of deliberation and premeditation, which is all that is required. (See *Solomon*, *supra*, 49 Cal.4th at p. 812 [""'Premeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection.'"'"].)  In the context of attempted murder, *People v. Lee*, *supra*, 31 Cal.4th 613, supports this conclusion.  There, the Supreme Court stated:  "[T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill. [Citation.] [¶] . . . Where, as in the present case, the natural-and-probable-consequences doctrine does not apply, such an attempted murderer necessarily acts willfully, that is with intent to kill.  In addition, he or she also necessarily acts with a mental state at least approaching deliberation and premeditation—concepts that entail ""'careful thought and weighing of considerations'"" and ""'preexisting reflection'"" [citation], as opposed to 'mere unconsidered or rash impulse hastily executed' [citation]—because he or she necessarily acts with knowledge of the direct perpetrator's intent to kill and with a purpose of facilitating the direct perpetrator's accomplishment of the intended killing."  (*Id*. at p. 624.)

The use of the term "during" in CALCRIM No. 401 did not allow the jury to find Joseph guilty of first degree murder without finding the appropriate mental state for the crime.  Since the instructions taken together accurately stated the law, there was no sua sponte duty to give a clarifying instruction.

ECF No. 16-22 at 15-16.

CALCRIM 401 provides that the intent to aid and abet can exist either before or during the commission of the offense.  However, as indicated with respect to petitioner's previous claim, in order to find first degree murder, jurors were instructed that a specific finding of first degree murder must include premeditation.  Supra at 10.

In any case, the California courts' rejection of this claim is not contrary to clearly established federal law as determined by the Supreme Court, does not involve an unreasonable application of clearly established federal law as determined by the Supreme Court, and is not based on an unreasonable determination of the facts.  This being the case, habeas relief is once again precluded by 28 U.S.C. § 2254(d).

/////

### 3. Evidence of Conspiracy (Claim 1)

At trial jurors were given instruction CALCRIM No. 416.  The instruction begins as follows: "The People have presented evidence of a conspiracy."  Petitioner claims that jurors were therefore informed that there was evidence of a conspiracy which violated his right to due process.  Not so; implicit in every instruction is the premise that the instruction is being given because evidence warrants it.  Telling a jury there is evidence of something does not diminish the jury's responsibility to find guilt only if the evidence demonstrates guilt beyond a reasonable doubt.

Further, petitioner does not point to anything suggesting that rejection of this claim by the California courts was contrary to clearly established federal law as determined by the Supreme Court, involved an unreasonable application of clearly established federal law as determined by the Supreme Court, or was as based on an unreasonable determination of the facts as required under 28 U.S.C. § 2254(d) for habeas corpus relief.

Under the heading for Claim 1, petitioner also claims that the jury was improperly instructed that first degree murder cannot be based upon the natural and probable consequence doctrine.  According to the Court of Appeal:

> The [California] Supreme Court held in *Chiu*, *supra*, 59 Cal.4th 155, that an aider and abettor of a target offense may not be convicted of first degree murder under the natural and probable consequences doctrine. Instead, "punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine." (Id. at p. 166.)

ECF No. 16-22 at 18-19.

The court can discern no reason why such an instruction violates federal law, and petitioner does not point to one.

### 4. Natural and Probable Consequences (Claims 2 and 3)

In claim 2, petitioner claims "[t]he jury was not instructed that murder under the natural and probable circumstances doctrine is to be guilty of second degree murder, and not first degree murder."  However, the natural and probable consequences instruction read to the jury, premised

upon CALCRIM 403 specifically informed them that if they found petitioner guilty of murder based upon the natural and probable consequences doctrine, murder is second degree, ECF No. 16-22 at 19.

To the extent the clarity of the instruction was diminished by others, the Court of Appeal found as follows:

> According to [petitioner], since the instructions for CALCRIM Nos. 520 and 521 provided for elevating second degree murder to first degree murder, the modified CALCRIM No. 403 did not prevent the jury from convicting him of murder under the natural and probable consequences theory in violation of *Chiu*. He claims the opening sentence of the CALCRIM No. 403 instruction, "Before you may decide whether the defendant is guilty of murder, you must decide whether he is guilty of assault with a deadly weapon," told the jurors the natural and probable consequences theory was the first step in climbing the ladder leading to first degree murder. He asserts the admonishment at the end of the instruction could easily be understood to mean the doctrine establishes at least second degree murder, but may still be elevated to first degree murder if the elements of first degree murder are met as well. . .
>
> As previously discussed, the jury was instructed under CALCRIM No. 520 that if it finds defendant guilty of murder, the murder is second degree "unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM No. 521," and was correctly instructed under CALCRIM No. 521 that first degree murder could be found only if the defendant "acted willfully, deliberately, and with premeditation." Furthermore, nothing in the admonition appended to CALCRIM No. 403 would allow the jury to find first degree murder under a natural and probable consequences theory. The phrase, "If you find a defendant is guilty of murder under the natural and probable consequences doctrine, you are instructed that this is murder in the second degree" is clear. Murder under a natural and probable consequences theory must be second degree murder.
>
> Since the instructions specifically limited first degree murder to premeditated and deliberate murder, since murder was second degree unless the jury found it to be first degree under this definition, and since the modification at the end of CALCRIM No. 403 was clear, there is no chance the jury would use the modified CALCRIM No. 403 to find Joseph guilty of first degree murder under a natural and probable consequences theory as an aider and abettor.

ECF No. 16-22 at 19-20.

In claim 3, petitioner makes a similar claim with respect to CALCRIM 417. The Court of Appeal identified and analyzed this claim as follows:

/////

14

[Petitioner] claims the instruction on conspiracy, CALCRIM No. 417, also violated *Chiu* as it failed to include any qualifying language on the portion of the instruction addressing natural and probable consequences for conspiracy. . .

As relevant here, the instruction states:

"A member of a conspiracy is criminally responsible for the crimes that he conspires to commit, no matter which member of the conspiracy commits the crime. [¶] A member of a conspiracy is also criminally responsible for any act by any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy. This rule applies even if the act was not intended as part of the original plan. [¶] A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. [¶] . . . [¶] To prove that the defendant is guilty of the crime charged in Count 1, murder, the People must prove that: [¶] 1. The defendant conspired to commit one of the following crimes: Murder or assault with a deadly weapon as to [Hernandez] [¶] 2. A member of the conspiracy committed murder to further the conspiracy; [¶] AND [¶] 3. Murder was a natural and probable consequence of the common plan or design of the crime that the defendant conspired to commit."

CALCRIM No. 417 does not address degrees of murder, but CALCRIM Nos. 403, 520, and 521 do. Those instructions make clear that murder under a natural and probable consequences theory must be second degree murder, murder is second degree unless the People prove beyond a reasonable doubt the elements of first degree murder, and a first degree murder has the mental state of premeditation and deliberation. Read together, and presuming the jury reasonably applied them, the instructions inform the jury that while [petitioener] may be liable for the natural and probable consequences of any conspiracy he belonged to, a conviction for murder as a natural and probable consequence of assault with a deadly weapon must be second degree murder.

It was not error to give CALCRIM No. 417 in this unmodified form.

ECF No. 16-22 at 20-22.

The Court of Appeal's decision that the instructions did not result in a misstatement of California law is not reviewable by this court. Hicks, 485 U.S. at 630 & n. 3 (federal habeas court is not at liberty to disregard a California Court of Appeal's rulings on state law when the California Supreme Court has denied review). Petitioner fails to point to anything suggesting a violation of federal law.

Also, under the heading for Claim 2, petitioner asserts there was no evidence he shared his

brother's state of mind as to the murder of Jesse Hernandez.  The court's finding above as to petitioner's claim that evidence of the requisite intent for first degree murder was insufficient, supra at 10, resolves this claim.

### 5. No Requirement of Unanimity (Claim 6)

Jurors were instructed as follows:

> "If all of you find that the defendant is not guilty of a greater charged crime, you may find him guilty of a lesser crime if you are convinced beyond a reasonable doubt that the defendant is guilty of that lesser crime.  A defendant may not be convicted of both a greater and lesser crime for the same conduct. [¶] Now, I will explain to you the crimes affected by this instruction. [¶] Voluntary manslaughter is a lesser crime of murder, charged in Count I."

ECF No. 16-22 at 16; CT 720.  Petitioner claims this instruction made it possible for jurors to find him guilty of first-degree murder without being unanimous; they simply had to be unanimous as to murder.  However, jurors were informed that any verdict or special findings reached by them had to be unanimous, CT 725, and the distinction between first and second degree murder was clear: "If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM No. 521."  CT 708.  This overarching unanimity command rendered any vagueness in the above instruction irrelevant.  There is no violation of federal law.

### 6. Failure to Instruct as to Involuntary Manslaughter (Claim 11)

Petitioner asserts the trial court should have, sua sponte, provided the jury with a basis via jury instructions to find petitioner guilty of involuntary manslaughter as opposed to first degree murder.  Petitioner fails to demonstrate that this omission amounted to a violation of federal law.  Since a writ of habeas corpus can only be granted for a violation of federal law, 28 U.S.C. § 2254(a), this claim must be rejected.  Furthermore, as noted by respondent, the failure of a state court to instruct on a lesser included offense is not a matter of federal law and cannot be considered in a habeas proceeding.  Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 200).

### C. Jury Question (Claim 7)

Petitioner claims the trial court's response to a question presented by jurors during deliberations violated his right to due process.  The California Court of Appeal addressed the

16

claim as follows:

> During deliberations, the jury sent a written question to the trial court seeking "clarification between 1st and 2nd degree murder." The trial court gave an oral response. It first directed the jury to CALCRIM No. 500 on homicide, and said murder was an unlawful killing with malice aforethought. It then told the jury, "If you find the defendant is guilty of murder, then you have to decide if it is first-degree or second-degree," and said first degree murder required premeditation while second degree murder did not.
>
> The answer continued with a "classic" example of second degree murder: "someone walks up to somebody on the street and just kills them, they don't—no prior contact whatsoever, they just kill them. Absolutely no premeditation or deliberation." The court next stated manslaughter was a lesser included offense of murder which the jury would have to consider if it found not guilty on murder. The court next addressed CALCRIM No. 520, the elements of murder, explaining the difference between express and implied malice. It gave the following "classic example" of implied malice: "a person has a gun and sees a passenger train going by on the tracks and he doesn't necessarily intend to kill anybody, he doesn't know anybody on the train, but he just fires at the windows, bang, bang, bang, bang. Now that would be—or could be implied malice. In other words, it's conscious disregard for human life."
>
> The court continued discussing malice aforethought and causation. It next told the jury that murder is in the second degree unless the People prove beyond a reasonable doubt first degree murder as defined in CALCRIM No. 521, and then set forth the requirements for first degree murder in CALCRIM No. 521. The court concluded its response by going over the natural and probable consequences doctrine and said natural and probable consequences murder was always in the second degree.

ECF No. 16-22 at 23-25

The California Court of Appeal found that the trial court's response was an appropriate description of California law, id. at 26 and this Court has no authority to find otherwise. Hicks, 485 U.S. at 630 & n. 3. Petitioner does not point to anything suggesting the rejection of the claim by California courts is contrary to clearly established federal law as determined by the Supreme Court, involves an unreasonable application of clearly established federal law as determined by the Supreme Court, or is based on an unreasonable determination of the facts. This being the case, habeas relief is again precluded by 28 U.S.C. § 2254(d).

D. Prosecutorial Misconduct (Claim 9)

Petitioner asserts that the prosecution made the following errors in closing:

1. Faulted petitioner for not taking the stand and explaining why his DNA was on the fishing pole;

2. Indicated circumstantial evidence alone can satisfy burden of proof; and

3. Suggested the jury could find guilt on a showing of reasonableness as opposed to guilt beyond a reasonable doubt.

As to point 1, neither the prosecution nor the court can make comments about a defendant's decision not to testify. Griffin v. California, 380 U.S. 609, 612 (1965). Comments regarding the lack of exculpatory evidence are not the same as comments about a defendant not testifying. United States v. Mende, 43 F.3d 1298, 1301 (9th Cir. 1995). "A prosecutor may comment on the defense's failure to present exculpatory evidence as long as the comment is not phrased to call attention to the defendant's failure to testify." Id.

Here, the prosecution merely commented on the lack of evidence supporting an innocent explanation as to why petitioner's DNA was on the fishing pole. ECF No. 17-22 at 33. No attention was called to petitioner's exercise of his Fifth Amendment rights and there was no violation of federal law.

As to the second point, generally speaking, circumstantial evidence is enough to support a conviction. E.g. U.S. v. Jaimez, 45 F.4th 1118, 1127 (9th Cir. 2005). Petitioner fails to point to anything suggesting anything more was demanded here.

As to the third assertion, the California Court of Appeal summarized the facts as follows:

> During the closing argument, the prosecutor stated that the jury could not use circumstantial evidence to prove "specific intent to kill" if "it's just impossible." The prosecutor continued: "[T]he law will instruct you that if there are two reasonable conclusions in regards to circumstantial evidence only to prove the mental state necessary—in this case the People have to prove and have proven the specific intent to kill. But in order for you to find the circumstantial evidence proves that intent, like I said, if you find that the circumstantial evidence is impossible to prove that, you cannot use it. [¶] The law will also say if there are two reasonable interpretations, meaning one reasonable interpretation points to guilt and one reasonable interpretation points to innocence, you must adopt the interpretation that points to innocence. However, the law will also tell you that you must reject the unreasonable. So you must be convinced that the only reasonable conclusion supported by the circumstantial evidence to prove intent or mental state is that the defendant is guilty. If you can draw two or more reasonable conclusions. However, you must accept only

18

> reasonable conclusions and reject the unreasonable. And in this particular case, you must reject any unreasonable argument and you must adopt reasonableness, in this case, to prove the state of mind to prove that they are guilty of murder. [¶] That's what this case does."
>
> Toward the end of closing, the prosecutor stated: "[A]s to both of these defendants, the only reasonable verdict, based upon the facts, based upon the law, is that they are both guilty of murder, the premeditated deliberate and willful murder" of Hernandez and assault on Rodriguez. [Footnote omitted.]
>
> During rebuttal, the prosecutor stated: "You know, and it's interesting. Have you not detected and noted that through the course of every single legal tenant is reasonableness? It must be reasonable. That's why it's proof beyond a reasonable doubt, not proof beyond all imaginary or possible doubt. Because everything in life is open to some possible or imaginary doubt."

ECF No. 16-22 at 28-29.

The Court of Appeal found that the prosecution did not commit misconduct. Id. at 32.

Making sense of the prosecution's argument is not an easy task. However, despite the confusing argument, it was made clear to jurors by the trial court that proof of guilt beyond a reasonable doubt was necessary to convict:

> A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt [unless I specifically tell you otherwise].

CT 672.

Even assuming that any portion of the prosecution's closing argument was improper, a prosecutor's improper comments violate the Constitution only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 106 (1986). There was no unfairness here as jurors were aware of the omnipresent reasonable doubt standard.

E.   Ineffective Assistance of Counsel (Claim 10)

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court held that ineffective assistance of counsel can provide a basis for habeas relief if it is shown that counsel's performance fell below an objective standard of reasonableness. Strickland, 466 U.S. at 688. However, a defendant must also affirmatively prove prejudice. Id. at 693. Prejudice is found

where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.

Petitioner claims that trial counsel's performance fell below an objective standard of reasonableness when he failed to present certain issues to the trial court.  It appears all such issues were raised in the Court of Appeal.  For example, petitioner asserted trial counsel was ineffective for failing to object to the prosecution's closing argument and the argument was addressed in the Court of Appeal.  As indicated above, this Court cannot upset any ruling by the Court of Appeal that found trial counsel acted in conformance with California law and the California Supreme Court denied review as to the claim.  Hicks, 485 U.S. at 630 & n. 3.  With respect to petitioner's claim concerning unanimity, III. B. 5, the Court of Appeal found a violation of state law, but found the error harmless.  ECF No. 16-22 at 16-18.  As indicated above, the court agrees that trial counsel's failure to object on state law grounds is harmless.  Supra at 16.

As for federal law, petitioner cites Griffin with reference to the prosecution's closing.  As indicated above, there was no Griffin error by the prosecution.  In all other respects, the federal challenges presented by petitioner to the Court of Appeal and / or California Supreme Court are either meritless or relief is barred by 28 U.S.C. § 2254(d).

IV.  Conclusion

For all of the foregoing reasons, the court recommends that petitioner's second amended petition for a writ of habeas corpus be denied.

Accordingly, IT IS HEREBY ORDERED that the Clerk of the Court assign a district court judge to this case.

IT IS HEREBY RECOMMENDED that petitioner's second amended application for a writ of habeas corpus (ECF No. 11) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations." In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant). A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any response to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  February 9, 2026

Carolyn K. Delaney

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

1
cast2005.157

21